LAW OFFICES OF
JEFFREY LICHTMAN
441 LEXINGTON AVENUE
SUITE 504
NEW YORK, NEW YORK 10017
www.jeffreylichtman.com

JEFFREY LICHTMAN
JEFFREY EINHORN
PAUL TOWNSEND

PH: (212) 581-1001
FX: (212) 581-4999

September 22, 2026

**BY ECF**
The Honorable Judge Paul A. Engelmayer
United States District Judge
Southern District of New York
40 Foley Square
New York, New York 10007

**Re: United States v. Wu, 26 Cr 245 (PAE)**
**Renewed Request for Bail**

Dear Judge Engelmayer:

This law firm represents Linxin Wu, the defendant in the above-referenced case. I write to renew Mr. Wu's request for bail and to correct and clarify some of the statements offered in the previous bail hearing, conducted on June 22, 2026 before this Court. As there is no presumption of detention in this case, I believe that this information will establish that a combination of factors exists that will assure that Mr. Wu will return for each court appearance as directed and does not constitute a danger to the community. See, 18 U.S.C. § 3142.

## I. INTRODUCTION

Mr. Wu has appeared before three separate judges to request bail be set in his case. First, on May 21, 2026 Magistrate Judge Lehrburger ordered detention, finding that Mr. Wu was both a flight risk and a danger to the community. Second, Magistrate Judge Willis heard arguments on June 10, 2026, and while still continuing detention, she very clearly indicated that she believed that there existed conditions to warrant release, and encouraged Jeffrey Chabrowe, then counsel for Mr. Wu, to answer the lingering questions she had. After Mr. Chabrowe attempted to allay Judge Willis' concerns with follow-up filings on the docket, this Court took up the matter and held a bail hearing on June 22, 2026. Relying on the representations made by both AUSA Christian Hines and Mr. Chabrowe, Your Honor determined that while this was certainly an unusual case, analysis of the relevant factors supported continued detention. See June 22, 2026 Hearing Transcript ("Tr."), at 55:25-56:3.

Having carefully reviewed the transcripts of the prior detention hearings, spoken extensively with Mr. Wu and a witness, and reviewed the Government's evidentiary production, the defense respectfully submits that several facts that weighed heavily in the Court's detention determination were inaccurate or materially incomplete. As a result, those facts presented Mr. Wu in a substantially more unfavorable light than is warranted by the record and an accurate recitation of the circumstances.

At the outset, it is critical to reiterate that Pre-Trial services recommends bail in this case. They did not recommend remand, finding that conditions exist which would adequately secure Mr. Wu's return to court and keep the community safe.

As this Court is well aware, Mr. Wu is a 26-year-old lawful permanent resident of the United States until 2031. He came to the United States alone at the age of 15. After several years of schooling, Mr. Wu left school to pursue his entrepreneurial ambitions and establish his own engraving business. He has been a productive member of this country for over 11 years and has built his life here without any familial support. Through his considerable skill and diligence, his business became successful. Mr. Wu developed a reputation for expertly engraving jewelry, trinkets, and other items for individual customers, as well as for corporations that would hire him to attend corporate events and provide his engraving services.

Mr. Wu is an inherently curious and inquisitive person. He enjoys taking things apart and putting them back together. He also enjoys exploring and seeing places he feels are interesting. He is not malicious, nor does he harbor any nefarious designs. In short, while there is admittedly some "smoke" due to his technological capabilities and intelligence, there is no "fire" to warrant detention. A significant amount of ink has been spilled concerning Mr. Wu's purported actions, much of which ascribes behaviors and motives to him which are simply wrong. With this submission, we attempt to correct the record, explain how the events giving rise to this case unfolded, and provide comfort to the Court that conditions exist which would adequately assure that Mr. Wu returns to each court appearance and that the community is safe. We first address the particular factual topics that were previously discussed to give the Court the necessary context to fully understand why the current characterization of Mr. Wu is incorrect, then we will discuss how those facts relate to the risk of flight and dangerousness criteria that the Court must consider.

## II. <u>FACTUAL BACKGROUND</u>

### A. Machinegun Conversion Devices

Mr. Wu is currently charged with two counts of Possession and Transfer of a Machinegun, in violation of 18 U.S.C. § 922(o)(1) and (2). Those are the sole counts of the

Indictment. The factual recitation in the Complaint alleges that in early June 2023, Mr. Wu mailed a machinegun conversion device ("MCD") for a glock pistol to the confidential human source ("CHS"). This MCD, depicted in the Complaint as "Image-3" is a metal box with "Glock, made in Austria" engraved on the top. The second count of the Indictment alleges that on March 14, 2026, Mr. Wu used his engraving equipment to laser cut a series of assorted pieces of metal into MCDs intended to be placed into semi-automatic assault rifles to convert them into fully automatic machineguns, and then transferred them to the CHS.

In late 2022, Mr. Wu met the CHS online through the online vendor Ebay. The two shared an interest in handheld radios and electronics programming. Mr. Wu believed the two were becoming close friends, to the point where Mr. Wu confided deep, personal secrets to the CHS. He did not know that the CHS was working with law enforcement to provide information on criminal activities on other individuals until after he was arrested. Instead, Mr. Wu thought that they were bonding over their mutual interest in electronics, piloting small planes, and legal firearms.

The foundation of the relationship between Mr. Wu and the CHS concerned the lawful buying and selling of handheld radios. In June 2023, Mr. Wu was sending the CHS a package containing some of these radios. He had come into possession of the small metal box depicted in the Complaint when a customer came in with many of them and asked for them all to be engraved. The customer brought extra and when he picked up the finished product, he left one with Mr. Wu. At the time, Mr. Wu was unaware what it was, but since the customer wanted it engraved with a Glock label, he surmised it was a Glock component. He sent a photo of it to the CHS as Mr. Wu had been told that the CHS owned a Glock firearm and he himself did not. Contrary to the assertions made by the Government at the prior bail arguments, Mr. Wu has no history with MCDs and this was not a part of some continuous and long-standing association or fascination with these devices.

Between June 2023 and March 2026, despite being in continuous contact with the CHS, there are no allegations that Mr. Wu created, possessed, transferred, or otherwise had any affiliation with other MCDs. In support of the Government's claim that Mr. Wu is thoroughly familiar with MCDs, they offered two videos, which were purportedly transmitted from Mr. Wu to the CHS in January 2023, a few months before the CHS received the first MCD in the mail. Screenshots of both of these videos were included in the Complaint as "Image-1" and "Image-2." Image-1 is a prop handgun, not a real firearm. The gun can only fire blanks. It is an EKOL Jackal Dual Compact. See Evidence Collected Item Log, at line 16, attached as Exhibit A.[1]

---

[1] The EKOL Jackal Dual Compact is intended to be a copy of the Beretta 92FS, but it does not fire live rounds, just blanks, the factory specifications make it clear that a standard model has a fully automatic firing mode. See https://www.replicaairguns.us/ekol-jackal-dual-compact-front-firing-blank-gun-pistol, last accessed on September 16, 2026.

Despite the inability to fire live ammunition, this replica airgun is capable of operating in semi or fully automatic form. There was no MCD involved in firing the blanks associated with this prop gun. Indeed, boxes of 9mm blank cartridges were also recovered during the search of Mr. Wu's apartment. Ex. A, at line 38.

The second video shows Mr. Wu holding a rifle directly on his hip firing it quickly. The Government has maintained that the quick rate of fire was accomplished through using an MCD. Again, this is mistaken. This is a semi-automatic rifle, it does not have any modifications or MCDs attached to it. Each time the weapon is fired it is done so with a distinct trigger pull, evidenced by the inconsistent rate of fire shown in the video. Mr. Wu was able to fire the gun rapidly, giving the appearance that a single trigger pull was rapidly discharging multiple shots, using what is called "the belt loop method." By looping one's finger through both the trigger guard as well as an individual's belt loop, a person can simulate a bump fire without the necessity of a bump stock:

> A shooter can also manually "bump" an AR–15 to increase the rate of fire by using a belt loop or rubber band to hold his trigger finger in place and harness the recoil from the first shot to fire the rifle continuously. See 83 Fed. Reg. 66532–66533 (2018). To use a belt loop, he must hold the rifle low against his hip, put his finger in the trigger guard, and then loop his finger through a belt loop on his pants to lock the finger in place. See id., at 66533. With his other hand, he then pushes the rifle forward until his stationary finger engages the trigger to fire the first shot. See ibid. The recoil from that shot pushes the rifle violently backward. See ibid. If the shooter keeps pressing the rifle forward against the finger in his belt loop, the repeated backward jump of the recoil combined with his forward pressure allows the rifle to fire continuously.

See Garland v. Cargill, No. 22-976, 602 U.S. 406 (2024) (Sotomayor, J., in dissent). The rifle portrayed in Image-2 in the Complaint is a standard semi-automatic rifle. It is not affixed with an MCD, it is simply firing at a high rate of speed as Mr. Wu is using his belt loop as a brace to capture the recoil of the gun weighed against pressure he was exerting on the grip to pull the trigger very quickly.

This is critically important as the Government is relying on these videos to assert that it was Mr. Wu who initially raised MCD's in conversation:

MR. HINES: Exactly. As we outline in the complaint in January, January 24 of 2023, the defendant sent the C.S. videos of him firing two

weapons, semi-automatic weapons, that had been altered to function as fully automatic machine guns.

THE COURT: So it's the defendant who starts the conversation about machine gun devices?

MR. HINES: Yes. He sends those videos, and that's Image 1 and Image 2 in the complaint...he was demonstrating that he had the ability to convert semi-automatic weapons to fully automatic weapons.

See, Tr. at 30:7-22. However when the Court inquires further into the point of sending these videos to the CHS, the Government had no repsonse, indicating that it would "want to double check." Tr. at 30:16-18. The Court then clearly relies on this claim as it opens its analysis of whether Mr. Wu presents a danger to the community by stating "in January of 2023, the defendant sends videos of him firing semi-automatic weapons altered with machine gun devices. He's the one who initiates the discussion or video sharing of firearms related information." Tr. at 56:8-12. The Court further indicated that between the videos and the provision of the MCD in the mail in June 2023, that it appeared that Mr. Wu was implicitly offering to make MCDs available to the CHS. Tr. at 56:18-19.

But there were no MCDs involved in these videos, nor did Mr. Wu ever allude that there were. Mr. Wu was not demonstrating for the CHS an ability to manufacture MCDs. He was merely sending videos of himself upstate firing weapons unaltered from their factory-made condition. He believed the CHS was interested in firearms as well and would find the videos entertaining. This in no way conveyed any offer to make an MCD for anyone, this fact is underscored by the simple truth that the June 2023 MCD sent to the CHS was clearly *not* made by Mr. Wu. The engraving equipment used to create the March 2026 thin pieces of metal is not capable of fabricating the metal box the CHS received in June 2023. Indeed, the Government concedes that he did not create the MCD referred to in Count I.

Mr. Wu did invite the CHS to visit him in New York. And there was discussion about going upstate to shoot guns. However, when Mr. Wu extended this invitation, there was no mention by him of machineguns or MCDs. Mr. Wu was referring to the semi-automatic rifle and prop gun he owned. The issue of MCDs and converting the semi-automatic rifle to a machinegun *did not arise until raised by the CHS immediately prior to his visit*. This visit, incidentally, only came about because *law enforcement directed the CHS to travel to New York*. See Complaint, at ¶ 6.

Contrary to what the Court was told and relied on when making a bail determination, it was the CHS who first posited the idea of creating MCDs and taking them upstate. Mr. Wu initially balked, he did not want to make them nor did he know how as he had never done so

before. Mr. Wu suggested using the legal guns he already had. Yet the CHS persistently pressured Mr. Wu to find instructions on the internet until he relented and agreed. It was at that point that the CHS provided the material for Mr. Wu to use. Mr. Wu received no payment for using his engraving machine to attempt to create the MCD, the CHS was drawing off Mr. Wu's belief that they were close friends. Despite the CHS offering Mr. Wu $300 multiple times to create the MCDs identified in Count II, and subsequently offering between $300 and $500 for more to be made later, Mr. Wu never asked for nor received any payment. In reality, the CHS was pressuring Mr. Wu into committing what the CHS knew to be a crime so that he could then cooperate against Mr. Wu and earn favor with the Government. Unsure of how to create an MCD, Mr. Wu cut a few different sizes of metal strips, and gave them to the CHS.

There is no question that Mr. Wu would never have created these MCDs on his own, he has been in the engraving business for nearly a decade and has never even considered making an MCD prior to the CHS' visit. His ignorance on the fabrication was further displayed as none of the MCDs he cut actually worked. They all resulted in the gun jamming. Law enforcement conducted an exceptionally thorough search of Mr. Wu's apartment, and did not find a single other MCD. The allegation is that Mr. Wu created these MCDs in mid-March 2026, but was not arrested until May 14, a full two months later. It is further corroboration that Mr. Wu did this as a one-time favor to a friend who was pressuring him that in the two months subsequent to his first (and only) attempt to create MCDs using his engraving equipment, there is no indication that he ever did so again, no mailing of additional units and no MCDs seized pursuant to the execution of the warrant.

This was the first, last, and only time Mr. Wu ever attempted to create or use an MCD. Mr. Wu did a favor for an individual working on behalf of law enforcement, under pressure, to create something he never would have thought to make on his own. The Court's assessment of Mr. Wu rested substantially on a mischaracterization, namely that he had been modifying weapons since 2023, gave dangerous devices away freely, and that his conduct reflected indifference to public safety. The information provided above demonstrates the opposite: Mr. Wu has no knowledge of or history with MCDs, he did not create the MCD in 2023, it never occurred to him on his own to make one, he only laser cut MCDs on one occasion due to pressure put on him by the CHS, despite the CHS offering him money he was never paid nor asked to be paid to make an MCD, the prior videos involving him shooting did not include any MCD and the guns involved were legal, and the only reason the CHS even came to New York to visit Mr. Wu - in the Government's own words - was that he was directed to by the Government.

B. MTA Subway Exploration

Despite no charges currently pending against Mr. Wu for anything related to trespassing in MTA tunnels, impersonating MTA employees, or possessing forged MTA credentials, much time has been spent ascribing some sort of nefarious intent to Mr. Wu's MTA exploration. Yet

for all the innuendo that has been parsed, no formal allegations have been brought against Mr. Wu with respect to his MTA activities. It is indisputable that the Government was aware of this behavior for years. The CHS and Mr. Wu were in continuous communication between 2022 and 2026, and the CHS was aware of Mr. Wu's habits. He shared information freely with the Government during this time.

The Court previously noted Mr. Wu's "impulse towards recklessness" (tr. at 58:14) with respect to gaining entry to MTA train cars and snooping around. While not charged, the Government expressed concern with this behavior, specifically the possession of forged badges, in some way indicates that the individual may "put those skills to use to facilitate a flight from law enforcement." Tr. at 39:6-7. First and foremost, Mr. Wu did not and cannot create fake identification badges. Second, an MTA employee ID badge is not a travel document. It does not contain security features common to actual travel documents (e.g. passports): no biometric chips, no machine-readable information, and no cryptographic signature. It is a simple identification card with no electronics added. Additionally, it would not permit an individual to board a plane. Possession of these MTA credentials would not aid Mr. Wu in any attempt to flee, nor is it indicative that he possesses some unique set of skills which would help him should he attempt to abscond. The Government readily admits that they cannot prove that he made any of the credentials. Tr. at 37:23-24. And incorrectly ascribes possession of a keyless entry fob to Mr. Wu. Tr. at 38:9-10. He did not possess a key fob. He had an ID badge and a vest. Neither of which he personally made.

Mr. Wu is inquisitive and impulsive, he likes to explore, and he enjoys seeing and experiencing things that the general public is typically excluded from. He does not harbor any malicious intent and he does not have any overarching ulterior motive. Seeing that his behavior with respect to the MTA was considered as a factor in his pretrial detention, his stay at the Metropolitan Detention Center has ushered in a very quick "[aging] out of the impulse we see in some young men to engage in reckless behavior." Tr. at 58:12-14. If granted bail, there would be no further attempts to gain entry to MTA tunnels, or restricted areas of MTA subway cars. Mr. Wu has confronted the consequences of impulsive and reckless behavior, even though it was not done with any criminal intent, or with any goal of causing harm, and he can assure the Court that severe restrictions have been instilled on his impulse nature.

C. Hand-Held Motorola Radios

As this Court is aware, similar to the MTA credential allegations, there is no charge relating to the handheld radios, despite the volume of discourse on the record about them. This is a hobby, and a small way that Mr. Wu makes money on the side. He reprograms radios for personal use. They are not "hacked" in the way implied by the Government. As the Court aptly surmised based on the prior arguments, "The facts there haven't been fully developed. They supply a degree of smoke." Tr. at 58:20-21. These undeveloped facts do not support detention.

Mr. Wu very clearly has some technical knowledge with respect to electronics. He built his engraving company from the ground up, built machinery, and works with these Motorola handheld radios. He is not, however, a dangerous hacker who can break the encryption technology to listen in on secure law enforcement radio channels. There is no allegation that Mr. Wu has done so. The Government contends that he transmitted a communication on a secure radio frequency. Tr., at 33:23-34:1. In reality this was a citywide public scanner channel. As Judge Lehrburger noted during the May 21, 2026 bail argument, "There's no evidence" of Mr. Wu accessing secure government transmissions. See May 21, 2026 Transcript of Bail Argument, at 49:20-50:4. The record should be clear that absolutely nothing about Mr. Wu's propensity to buy, sell, or lawfully reprogram radios suggests that he would be a flight risk or is dangerous to the community. To the extent that a single broadcast was made on this citywide channel, that fact hardly supports the claim that Mr. Wu represents any sort of danger.

For all the information supplied by the CHS to the Government, there is no formal charge against Mr. Wu relating to these radios, and the contention from past bail arguments is that he sent a single broadcast out on a citywide channel. What Mr. Wu does with these radios is legal. They are purchased on Ebay, the online marketplace. The radios he keeps for himself are reverse-engineered, but that does not grant sinister unauthorized access. The radios he resells are not modified at all, they are factory standard, he merely tries to sell them for a modest profit. Under Van Buren v. United States, 18 U.S.C. § 1030 prohibits exceeding authorized access with respect to a computer. 593 U.S. 374, 379 (2021). However, "it defines the term 'exceeds unauthorized access' to mean 'to access a computer without authorization and to use such access to obtain or alter information in the computer that the accesser is not entitled to obtain or alter.'" Id. Mr. Wu did not gain any access to any information to which he was not entitled.

Many people benignly listen in to citywide public law enforcement radio channels. Journalists, private investigators, and tow-truck drivers all routinely utilize these channels to aid in their work. The simple fact that Mr. Wu buys and sells these radios is no indicator that he presents some sort of danger. There is no allegation that he has ever used his technological competency to attempt cause harm or unlawfully benefit himself. Consequently, the "smoke" associated with these radios should not be considered a factor favoring detention.

## III. ANALYSIS OF BAIL CRITERIA

### A. Risk of Flight

In a case where there is no presumption of detention the Government is required to prove Mr. Wu poses a risk of flight by a preponderance of the evidence. They have not done so in this case, and Pre-Trial services supports our request that bail be set.

After summarizing the Government's asserted facts during the prior bail argument, the Court noted that "all of those facts put together give me grave concern of the danger of flight." Tr., at 59:1-2. However, upon reflecting the facts as we now know them to be, the risk of flight is certainly not established. The skills that Mr. Wu possesses certainly have helped make his engraving business successful and have given him the ability to make some additional money buying and selling Motorola radios, but they would be of no value in attempting to flee the jurisdiction.

Often, the Government cites the strength of the evidence to support the notion that a criminal defendant has incentive to flee and Courts accept as a matter of course that strong evidence leads to a greater likelihood of conviction and therefore a greater chance that a defendant will seek to avoid punishment by leaving the jurisdiction. At the prior bail hearing, the Court highlighted that a key reason that bail was being denied was that Mr. Wu was the person who continuously brought up MCDs to the CHS. He was alleged to send the CHS videos of himself firing guns augmented by MCDs, that did not happen. When the CHS visited - at the direction of law enforcement - it was *his insistence and pressure* that led Mr. Wu to craft the MCDs. Mr. Wu was not predisposed to make these at all. The evidence in this case is not that Mr. Wu is fixated on MCDs and personally uses and gives them away them regularly. Quite the opposite.

The Court also expressed concern that Mr. Wu did not have significant, deep relationships with friends in the United States as there were no individuals listed willing to come forward and sign a bond at the prior bail hearing. Tr., at 59:8-11. Mr. Wu does have friends, and multiple individuals have contacted the undersigned and expressed a willingness to sign a bond. Most of Mr. Wu's friends and associates are his contemporaries in age, he is 26 years old, and they have just recently started their careers and have not yet accrued significant assets which they could post for his release. They are, however, incredibly supportive of Mr. Wu and have stated to me that they're willing to appear before this Court and sign a bond for what they have if it will assist in securing his release. His parents also have approximately $25,000 in the United States which they will pledge for Mr. Wu's release.

The moral suasion inherent in this cannot be overstated. These friends of his are individuals who have just entered the workforce, who do not have substantial assets to fall back on, and who would be wiped out and devastated if Mr. Wu were to flee and they were to forfeit their postings. While their assets may not hold a great financial value, they represent the sum total of the worldly possessions that these people own. Mr. Wu would not subject his closest friends to certain financial ruin.

While being accused of transferring MCDs is serious, a reasonable guidelines calculation still puts this case within a relatively low sentencing range. This is not being offered to suggest

that the case is trivial or in any way but merely that the threat of a long period of incarceration is not present here.

Finally, Mr. Wu was aware that he was under investigation, his private pilot credentials had been revoked months prior due to security concerns and he received a copy of a grand jury subpoena issued concerning him in January 2025, and yet he did not flee. This subpoena even listed the charges for which he was being investigated. See, April 13, 2023 Subpoena to Google, attached as Exhibit B. He instead hired Mr. Chabrowe, the lawyer who represented him until July 2026. Mr. Wu could have easily attempted to avoid prosecution by running when he became aware that he was under investigation, but he did not. He has no intention of fleeing now.

In short, upon consideration of the totality of the circumstances brought to light in this case, the Court should take determine that Mr. Wu is not a flight risk.

B. Dangerousness to the Community

There is no question that, as a general principle, MCDs pose some risk of danger to the community. But an examination of the unique facts in this matter establish that sufficient mitigation exists to conclude that Mr. Wu himself does not pose a danger.

Like many people, Mr. Wu enjoys the recreational lawful use of firearms. He has friends who live upstate, and he travels to their property to shoot guns. The CHS noted his own interest in firearms to Mr. Wu which led to Mr. Wu sharing the two videos of himself at the rural property firing the prop gun and the semi-automatic rifle. No MCDs were involved, nor did the communications surrounding those videos ever indicate that Mr. Wu was employing MCDs. The guns he shot were lawfully possessed and were not manipulated. Appropriate safety precautions were taken. There is no allegation anywhere that Mr. Wu has ever committed a crime of violence or brandished a firearm at an individual. He simply enjoys his Constitutional right to bear arms and shoot at targets.

In 2023 he came into possession of the metal box with the Glock label. The CHS had indicated to him that he had a Glock, and Mr. Wu decided to send a photo of the box to the CHS and then ship it to him with some radios. There was no discussion about MCDs, no payment requested or offered, and it was an isolated incident. There is no evidence that Mr. Wu even knew that the box was an MCD at the time. It was labeled as a Glock attachment, so Mr. Wu informed the CHS that he would send it to him, knowing he had a Glock. In the message, the metal box is referred to as "something extra" being included in the package with the radios being sent. Mr. Wu does not describe the object as an MCD. Then, for the next 33 months, there is no mention of MCDs, despite the CHS and Mr. Wu speaking frequently, *until the CHS brings up the subject*.

Based on the representations made at the prior hearing, the Court concluded that the "return" to MCDs after such a long period of time suggested a "durable interest" in the machinery, yet the facts actually point to Mr. Wu's naivety and disinterest in these devices. The roughly three years between when the first device was mailed to the CHS and when the CHS pressured Mr. Wu into creating the new units shows a total disinterest in MCDs outside of the CHS input. In 2023 aside from the mailing of that single unit, there is no further discussion about MCDs, no offer to try to source more, no offer to make any, and no information as to any other person to whom he transferred any MCDs. In short, Mr. Wu found himself in possession of a little black box marked Glock which he mailed to a friend who had a Glock and then the device was never brought up again. Years later the CHS visited and asked Mr. Wu to use his equipment to cut MCDs *because the CHS wanted to use them*. Mr. Wu balked and did not originally want to do it. But over the course of the CHS's visit, he wore Mr. Wu down and leveraged their friendship to convince him to make it. The CHS not only pressured Mr. Wu to do it, he supplied the materials used to make them.

But the CHS did not just pressure Mr. Wu. At a few dinners during his visit to New York, covertly recorded by the CHS, another friend of Mr. Wu, Leandro Lima, was also present. The CHS recorded the entirety of the dinners, and the video files were produced in discovery. The CHS requested that Mr. Lima aid him in committing financial crimes over and over again. The CHS claimed to have millions of dollars for which he could not account because he admitted he did not have a way to show legitimate income. He discussed currency transaction reports as a problem for him being able to move large sums of his money around. He stated to Mr. Wu and Mr. Lima "Cuz if we have to clean it, we're gonna lose like thirty percent. That's cool. That's the rate. I'm good with that." He asked Mr. Lima for assistance in making his money appear legitimate and growing it with investments. Mr. Lima stated that he would require proof of the legitimacy of the funds, which the CHS could not provide.

Further, Mr. Lima personally observed, on several occasions, Mr. Wu expressed that he did not want to make the MCDs for the CHS. Mr. Lima heard Mr. Wu tell the CHS that shooting the prop gun and lawful AR-15 was sufficient, and he heard the CHS repeatedly pressure Mr. Wu, despite his reluctance. When Mr. Wu finally relented and crafted the items, the CHS told Mr. Lima that Mr. Wu was busy making something specifically for him. Mr. Lima also personally observed the CHS at another dinner, this one included Mr. Wu's business partner. Mr. Lima observed the CHS also pressure Mr. Wu's business partner to engage in financial crimes, which he was also reluctant to do. Mr. Lima corroborates Mr. Wu's account of the CHS' activities. Mr. Wu never wanted to make these MCDs and only did so at the constant badgering of the CHS.

While some of the conduct, specifically in regards to the creation of the MCDs in 2026, was recorded by the CHS, much of the information which has been supplied to law enforcement and which has constituted the basis the conclude that Mr. Wu is a danger to society comes

directly from the CHS. But his credibility is seriously undermined. The CHS is cooperating with law enforcement following his own conviction for multiple burglaries. He is strongly incentivized to find new criminal behavior and alert his handlers. The more serious he can make Mr. Wu's case out to be, the more valuable he will be as an asset. As a result, the CHS fabricated stories about Mr. Wu's "hacking" abilities and behavior. Additionally, the CHS participated in Mr. Wu's exploration in the MTA tunnels and subway cars, using his own forged credentials and uniform.

Mr. Wu is not a danger to the community. He does not have any predisposition towards making or possessing MCDs. He is a loyal friend who did a favor, without receiving any payment, while knowing he should not do it. The fact that 33 months passed between these two alleged incidents should be construed to show that MCDs are not an interest or part of any business plan.

## IV. MR. WU'S AUGMENTED PROPOSED BAIL PACKAGE

Mr. Wu submits the following proposal to secure his release:

- A personal recognizance bond of $800,000 to be secured by Mr. Wu's bank account (the bank statements have been previously provided to the Court but are available off the public record should the Court request) as well as by three other financially responsible persons: Charles Barrett, Dominick Burzo, and his father, who have confirmed that they will pledge Mr. Barrett's retirement savings account with approximately $27,000, Mr. Burzo's Lexus ES 350 vehicle which he owns free and clear, and his father's bank account showing a balance of $25,000;
- Mr. Wu's parents will alternate residing with him to supervise him and ensure strict compliance with Pre-Trial Services;
- Home confinement with GPS ankle location monitoring;
- Surrender of any additional travel documents requested (his passport has already been surrendered); and
- any additional conditions that Pre-Trial Services deems appropriate.

## V. CONCLUSION

There is an understandable specter of fear present when one is charged with transferring a machine gun. However, when one examines the totality of the circumstances present in this case, it becomes clear that Mr. Wu's conduct is not nearly as serious or grave as the charges make it seem. As the Court noted in the last bail hearing, there is some "smoke" surrounding some of Mr. Wu's actions, however, there is insufficient "fire" to warrant pre-trial detention. There is no indication that Mr. Wu has done anything malicious or dangerous with respect to the hand-held

Motorola radios he tinkers with. There is no evidence that any of the materials relating to the MTA are intended to be used for any purpose beyond curious exploration. While acknowledging that Mr. Wu should not be in possession of MTA employee ID badges, that should not preclude bail.

The small metal box sent in 2023 was an afterthought on a shipment of radios. There's no indication that Mr. Wu was aware of its nature apart from being a Glock compatible part. And the CHS was the driving force behind the creation of the MCDs in March 2026. It was his idea, he wanted them, he pressured Mr. Wu to make them, he supplied the materials, and he would not back down when Mr. Wu suggested they just use the guns he already had. If not for the persistence of the CHS, Mr. Wu would never have made them.

Mr. Wu intends to fight this case in court, he will not flee, and he will not commit any offenses if released. He will be supervised by a parent at all times, and he will have the moral suasion of some friends' entire financial subsistence being forfeited if he absconds. The Court should feel comfortable ordering the bond for Mr. Wu's release.

Respectfully submitted,

Paul Townsend

Paul Townsend

Enc

CC: All Counsel (via ECF)