**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Jacob K. Javits Federal Building*
*26 Federal Plaza, 37th Floor*
*New York, New York 10278*

September 25, 2026

**BY ECF**
The Honorable Paul A. Engelmayer
United States District Judge
Southern District of New York
40 Foley Square
New York, New York 10007

**Re: *United States v. Linxin Wu*, 26 Cr. 245 (PAE)**

Dear Judge Engelmayer:

The Government respectfully submits this letter in response to defendant Linxin Wu's September 22 renewed application for bail. (*See* Bail Appl. (Dkt. 45)). Wu's latest request, his third application for bail, is premised on baseless assertions and mischaracterizations of the record. Nothing has changed since the Court ruled at the June 22 hearing (the "Bail Appeal Hearing") that this was not "a particularly close case," (Bail Appeal Tr. at 55:23–25 (Dkt. 25)), and ordered Wu, who is charged with two counts of possession and transfer of a machinegun, in violation of 18 U.S.C. §§ 922(o)(1) and 2, detained on both dangerousness and risk of flight grounds. If anything, the Government's continued review of electronic devices seized from Wu has made the case against bail even stronger. For the reasons set forth below, as well as those articulated by the Court at the Bail Appeal Hearing, the defendant continues to pose a danger to the community and presents a significant risk of flight. Accordingly, the Government respectfully submits that the Court should adhere to its prior ruling and order Wu's continued detention pending trial.

## I. Background

### A. The Offense Conduct

The Government alleges that on October 31, 2022, Wu began communicating with a confidential source (the "CS") through Signal Messaging Service, an encrypted messaging application. (Compl. ¶ 5(a) (Dkt. 1)). In subsequent months, Wu sent the CS messages via Signal stating that Wu possessed modified weapons and high-capacity magazines. (*Id.* ¶ 5(c)). Wu also sent the CS a photograph of a machinegun conversion device ("MCD") in his possession, and, eventually, an MCD itself. (*Id.* ¶¶ 5(c)–(d)).

On several occasions since that time, Wu invited the CS to visit him in New York so that they could, among other things, fire automatic weapons at a property in upstate New York. (*Id.* ¶ 6). On February 23, 2026, at the direction of law enforcement, the CS accepted this invitation, and, approximately three weeks later, on March 14, the CS met Wu in Manhattan and covertly

audio- and video-recorded their conversations and interactions throughout the day. (*Id.* ¶ 7). At approximately 11:17 a.m. that morning, Wu showed the CS an MCD that he had manufactured out of titanium and acknowledged that simply possessing such a device could "put[] [him] in jail for three years." (*Id.* ¶ 7(a)). Wu then gave the CS three MCDs, which the CS subsequently provided to law enforcement. (*Id.* ¶ 7(b)). Later that afternoon, Wu and the CS traveled to a rural property in upstate New York, where Wu inserted an MCD into an assault rifle and explained to the CS how the device would function when the rifle was fired. (*Id.* ¶ 7(d)). A video- and audio-recording of the assault rifle being fired later that evening indicates that Wu had successfully converted the rifle into a fully automatic machinegun. (*Id.* ¶ 7(e)).

On March 15, 2026, after the CS and Wu had returned to Manhattan, the CS visited Wu at Wu's apartment and covertly audio- and video-recorded their meeting. (*Id.* ¶ 8). Wu showed the CS how he uses a laser engraving machine to manufacture MCDs and gave the CS two additional MCDs that he had manufactured during their meeting. (*Id.* ¶ 8(a)–(c)).

B. <u>Procedural History</u>

On May 12, 2026, Magistrate Judge Netburn authorized a complaint charging Wu with violations of 18 U.S.C. §§ 922(o)(1) and 2 and issued a warrant for Wu's arrest. Wu was arrested and presented before Judge Netburn on May 14, 2026 and consented to detention without prejudice to a subsequent bail application.

1. *First Detention Hearing*

On May 19, 2026, Wu filed his first application for bail. (Dkt. 5). The Government filed its response (the "First Bail Opposition") on May 20, 2026.

Following a bail hearing on May 21, 2026, Magistrate Judge Lehrburger concluded that the Government had met its burden to establish that no condition or combination of conditions would reasonably assure the defendant's appearance in court or the safety of the community. (*See* Bail Hr'g Tr. (May 21, 2026), at 55:20–57:23). Judge Lehrburger described the defendant as "someone whose recklessness poses a danger to the community," (*id.* at 56:25–57:1), and whose lack of ties to the United States, incentive to flee, and technical abilities (including an ability "to falsify his persona") presented a clear flight risk, (*id.* at 56:4–17). Judge Lehrburger denied the defendant's bail application without prejudice, however, holding open the possibility that the defense could, in theory, propose a set of conditions that might address the Court's concerns, though it had not done so. (*See id.* at 57:2–21).

2. *Second Detention hearing*

Wu renewed his bail application on May 29, 2026, proposing that his parents, who, like Wu, are Chinese citizens, travel to the United States and supervise him at his apartment. (Dkt. 11). The Government filed its opposition (the "Second Bail Opposition") on June 9, 2026.

At the end of a bail hearing on June 10, 2026, Magistrate Judge Willis concluded "that it is possible that there are conditions that can be sculpted that would reasonably assure Mr. Wu's

return to court and the safety of the community[,]" but that, "in order to sculpt those conditions," Wu first had to produce more information about his and his parents' financial assets, so that the Court could set an appropriate bond amount, and an appropriate amount of assets to secure any such bond. (*See* Bail Hr'g Tr. (June 10, 2026), at 55:16–21, 60:23–61:2). The Government received a limited subset of the records that Magistrate Judge Willis ordered to be produced.

3. *Indictment*

On June 10, a grand jury in this District returned an Indictment charging Wu with two counts of possession and transfer of a machinegun, in violation of 18 U.S.C. §§ 922(o)(1) and 2. Count One charged Wu with possession and transfer of a machinegun in connection with his mailing of an MCD to the CS in June 2023. Count Two charged Wu with the same offense in connection with his possession and transfer of multiple MCDs to the CS in March 2026.

4. *Bail Appeal Hearing*

At the Bail Appeal Hearing held on June 22, 2026, this Court concluded that "although this is an unusual case," it is not, "on either prong[,] a particularly close case." (Bail Appeal Tr. at 55:23–25). As discussed in greater detail below, the Court therefore detained Wu based on both his danger to the community, (*see id.* at 56:4–59:5), and his risk of flight, (*see id.* at 59:6–62:16).

## II. Applicable Law

A defendant must be detained where "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community." 18 U.S.C. § 3142(e). "The Government has the 'burden of persuasion by clear and convincing evidence that the defendant presents a danger to the community,' and 'by the lesser standard of a preponderance of the evidence that the defendant presents a risk of flight.'" *United States v. Henry*, No. 25 Mag. 23 (AT), 2025 WL 240902, at *1 (S.D.N.Y. Jan. 17, 2025) (quoting *United States v. Mercedes*, 254 F.3d 433, 436 (2d Cir. 2001)).

In evaluating whether the Government has carried its burden, the Court must consider:

> (1) the nature and circumstances of the offense charged, including whether the offense is a crime of violence . . . or involves a . . . controlled substance [or] firearm . . . ;
>
> (2) the weight of the evidence against the person;
>
> (3) the history and characteristics of the person, including –
>
> > (A) the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings; and
> >
> > (B) whether at the time of the current offense or arrest, the person was on probation,

on parole, or on other release pending trial, sentencing, appeal, or completion of sentence for an offense under Federal, State, or local law; and

(4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release.

18 U.S.C § 3142(g).

After a court has made an initial determination that no condition or combination of conditions will ensure a defendant's appearance or the safety of the community, it may "reopen the bail hearing if 'information exists that was not known to the movant at the time of the hearing and that has a material bearing on the issue' of whether pretrial detention is warranted." *United States v. Maxwell*, 510 F. Supp. 3d 165, 169 (S.D.N.Y. 2020) (quoting 18 U.S.C. § 3142(f)). A court "is not required," however, "to reopen the hearing or to conduct another hearing if it determines that any new information would not have a material bearing on the issue." *Id.* (gathering authority). "A court may also revisit its own [bail] decision pursuant to its inherent authority, even where the circumstances do not match § 3142(f)'s statutory text." *Id.*

## III. Discussion

In its renewed application for bail, the defense wrongly suggests that the Government misrepresented key facts during the Bail Appeal Hearing, (*see* Bail Appl. 1, 3, 4–5, 6), and argues that the Court detained Wu based on a record that was "inaccurate or materially incomplete[,]" (*id.* at 2). For the reasons set forth below, the defense's arguments are meritless, and the Court should decline to revisit its previous detention determination.

### A. Nature and Circumstances of Offense Charged

As the Court previously observed, a discussion of the defendant's bail application "could start or end with the underlying conduct here." (Bail Appeal Tr. at 56:7). MCDs "are dangerous things"; they "are things that enable a danger to the community." (*Id.* at 56:5–6). Relying on the fact that Wu "initiate[d]" discussions relating to firearms and subsequently "sen[t] an actual machine gun device to the confidential source," the Court found that, even if one were to "stop the narrative at this point," it is clear Wu was "at least impliedly offering to make machine gun devices available to the confidential source[.]" (*Id.* at 56:10–12, 14–15, 16–17). "That," the Court concluded, "is a danger to the community." (*Id.* at 56:23–24; *see also id.* at 57:1–5 ("And it doesn't help that Mr. Wu, on the assembled evidence, appears to be something of a gun enthusiast and apparently to associate at least in part with people . . . who could make useful use of a machine gun converter device[.]")).

That Wu resumed transferring MCDs to the CS approximately three years later is "a bad fact, not a good fact[.]" (*Id.* at 57:14). The defendant's conduct "suggests a durable interest in this type of machinery[,]" and, far from reluctantly agreeing to assist the CS, as the defense now claims, Wu "display[ed] [the MCDs] with pride[,]" even acknowledging that merely possessing such devices could result in a substantial sentence of imprisonment. (*Id.* at 57:12, 14, 16–18; *see also id.* at 57:18–20 ("He is well aware of the illegal nature[,] of the *mala in se* quality, if you will,

of a machine gun converter device.”)). These and other facts led the Court to conclude “that the defendant is interested in some level in making this a line of his work, in distributing machine gun devices[,]” which is clearly “an indicator of dangerousness.” (*Id.* at 57:24–58:2).

The defense now argues that the Court’s understanding of the offense conduct was premised on mischaracterizations by the Government, focusing broadly on (1) Wu’s initial MCD transfer in June 2023, (2) Wu’s subsequent transfer of multiple MCDs in March 2026, and (3) Wu’s alleged lack of interest in or familiarity with MCDs more generally. (*See* Bail Appl. 2–6, 9–12). But these arguments are squarely foreclosed by the record evidence in this case, as discussed below.

1. *January 2023: Wu Initiates Discussion of, and Describes Ability to Manufacture, MCDs*

The central (false) premise of Wu’s latest bail application is that he had no interest in, let alone any knowledge regarding, MCDs; rather, it was the CS who insisted on broaching the topic and eventually coerced Wu into manufacturing and transferring these devices. The defense asserts, for example, that Wu “was unaware what [the initial MCD] was” when it came into his possession, (*id.* at 3); that Wu “has no history with MCDs,” (*id.*); that his decision to send the CS a picture of such a device—and later to mail the device itself—“was not a part of some continuous and long-standing association or fascination with these devices[,]” (*id.*); that Wu “was not predisposed to make these at all,” (*id.* at 9); and that Wu “ha[d] never even considered making an MCD prior to the [CS’s] visit [in 2026],” (*id.* at 6).

These and similar assertions throughout the defense’s latest application are demonstrably false. It is Wu who first appears to have broached the topic of firearms, sending the CS a photo of an AR-15-style assault rifle, unprompted, on November 11, 2022. (Ex. A at 236).[1, 2] The next documented exchange regarding firearms occurred on January 3, 2023, when Wu—again, without prompting—sent the CS a photo of a magazine and wrote, “[g]ot that gansta [sic] clip,” and “Texas is the shit lol TSA blessed me with just taking the springs.” (Ex. B at 522–23). The CS and Wu then engaged in a brief exchange regarding firearms, with Wu describing in detail how he can modify his assault rifle to fire a greater volume of ammunition more quickly. (*See id.* at 523–27). The CS, meanwhile, responded with minimal engagement. (*See id.*). Then, on January 4, 2023, without any solicitation or prompting by the CS, Wu wrote, “[p]lus I can laser cut a lightning link *if you know what that is*” / “To make it biu biu biu[.]” (*Id.* at 527 (emphasis added)). A lightning

[1] Exhibits A, B, and J are excerpts of communications between Wu and the CS. The blue text on the left belongs to Wu; the green text on the right belongs to the CS. Pinpoint citations for these exhibits refer to the native pagination in the excerpted communications.

[2] The Government will share all exhibits—which consist of communications, photographs, and audio- or video-recordings (or the relevant portions thereof) that have been produced by the Government in discovery—with the Court and counsel via the USAfx file-sharing platform.

link, of course, is a type of MCD that can be inserted into an AR-15 assault rifle and used to convert it into a fully automatic machinegun.[3]

The CS continued to engage in a discussion regarding firearms generally but did not immediately address or respond to Wu's comment regarding MCDs or his ability to manufacture them. (*See id.* at 528–31). Then, after the two exchanged several additional messages, the CS sent Wu a picture of an MCD without any accompanying message or context. Wu responded: "Oof" / "Autosear?" (*Id.* at 532).[4] After an intervening message responsive to a different text from Wu, the CS responded, "[y]ep." (*Id.* at 533). Wu then wrote: "Lightning links are better." (*Id.*). At this point, the following exchange occurred:

| **Wu** | **CS** |
| --- | --- |
| I have the graphic files | |
| I can just laser cut them | |
| Use them at a safe location | |
| | They stand up to the heat? |
| And then just destroy and toss them | |
| They are stainless steel | |
| | Copy |
| They are cheap to make lol | |

[3] *See, e.g.*, Dep't of Justice, "YouTuber And Auto Key Card Manufacturer Sentenced to Five Years in Prison For Transferring Unregistered Machinegun Conversion Devices" (Sept. 8, 2023), https://www.justice.gov/usao-mdfl/pr/youtuber-and-auto-key-card-manufacturer-sentenced-five-years-prison-transferring (last accessed Sept. 24, 2026) (explaining that lightning links can be "etched into metal cards" and then used as MCDs); *see also* Bureau of Alcohol, Tobacco, Firearms, and Explosives, Machinegun Conversion Devices Fact Sheet (undated) ("ATF Fact Sheet"), https://www.justice.gov/usao-wdok/media/1366621/dl?inline (last accessed Sept. 24, 2026) (explaining that MCDs include devices commonly referred to as "Lightning Link[s]").

[4] An auto sear is another name for a type of MCD. *See* ATF Fact Sheet.

I make look into u

It

Just etch them on a metal business card

And put them in your wallet

(*Id.* at 534–37). The conversation continued in this vein, with Wu eagerly explaining the benefits of lightning links—*e.g.*, "[t]hey are just a metal business card if you get pulled over"; "[o]nce you get to your safe location to have fun just simply punch them out"; "[w]hen you finish just toss them"; "[c]ost less than a buck to make"—while the CS showed light interest ("Cool"; "Nice"; "I like."). (*See id.* at 537–39).

Then, after the CS sent two graphics related to MCDs, Wu responded with a picture that appears to show him holding a different type of MCD—colloquially known as a "Glock Switch"—and wrote, "[g]ot some Glock switches too." (*Id.* at 541). This appears to be the same MCD that Wu would send to the CS several months later. The CS responded with two other pictures of MCDs (both without accompanying text), and jokingly wrote—with respect to the latter image—"[c]an opener." (*Id.* at 542–43). Responding directly to that image, Wu wrote, "[t]his is a straight up felon [sic]." (*Id.* at 543). When the CS again suggested coyly that the device was merely a can opener, Wu wrote, "[y]eah try to argue that with ATF" / "[a]nd the judge." (*Id.* at 544–45).

This initial exchange regarding firearms and MCDs reveals several important facts. First, it is Wu, not the CS, who initially broached the topic of both firearms generally and MCDs specifically. Second, the first time Wu raised the topic of MCDs was to tell the CS *that he could make them*, and he introduced the topic without assuming that the CS was even familiar with the device to which he was referring ("[p]lus I can laser cut a lightning link *if you know what that is*" (emphasis added)). Third, the conversation shows that Wu was not only familiar with MCDs, but in fact highly knowledgeable about—and possessed strong views regarding the comparative virtues of—different types of MCDs ("[l]ightning links are better"; "[t]hey are stainless steel"; "[t]hey are cheap to make lol"). Fourth, without any solicitation or prompting from the CS, Wu again raised the fact that he could manufacture MCDs himself ("I have the graphic files"; "I can just laser cut them"). Fifth, Wu knew exactly what a Glock Switch is and what it does. In the midst of an exchange regarding MCDs, Wu sent the CS a photo of such a device and said, "[g]ot some Glock switches too." And finally, Wu acknowledged that these devices were illegal and could bring serious punishment ("[t]his is a straight up felon"; "[y]eah try to argue that with ATF . . . [a]nd the judge").

This thread between Wu and the CS forecloses the argument, advanced in the defense's latest bail application, that Wu transferred MCDs to the CS out of ignorance, naivete, or despite some abiding reluctance—let alone that he was somehow entrapped into doing so. Given Wu's knowledge, enthusiasm, and technical wherewithal regarding MCDs, it is no surprise that he mailed such a device to the CS—again, without prompting—months after this exchange occurred.

2. *March 2026: Wu's Second MCD Transfer*

Turning to Wu's second MCD transfer in March 2026, the defense contends that it was the CS, not Wu, who proposed manufacturing MCDs and traveling with them upstate. (Bail Appl. 5). In the defense's version of events, Wu wanted nothing to do with MCDs, knew nothing of how to make such devices, "initially balked" at the CS's request, and only relented after the CS badgered him to "find instructions on the internet[.]" (*Id.* at 6). "There is *no question*," the defense avers, "that Mr. Wu would never have created these MCDs on his own," as he "has been in the engraving business for nearly a decade and *has never even considered* making an MCD prior to the [CS's] visit." (*Id.* (emphasis added)).

The problem with these assertions is that they are patently undermined by Wu's own messages to the CS years before the March 2026 visit occurred. As discussed, it was Wu who first raised the topic of manufacturing MCDs, (*see* Ex. B at 527)—and he was clear and assertive in describing his ability to do so. "I *have* the graphic files [for lightning links]." (*Id.* at 534 (emphasis added)). "I *can just* laser cut them." (*Id.* (emphasis added)). "They are stainless steel" and "cheap to make lol." (*Id.* at 535–36). "Just etch them on a metal business card," (*id.* at 536), and "simply punch them out" and "use them," (*id.* at 538 (emphasis added)). The Government therefore disagrees that there is "no question" Wu "would never have created these MCDs on his own." (Bail Appl. 6). Three years before the CS visited Wu in New York, Wu had boasted about doing precisely that.

The Government has not identified any documented conversations in which Wu and the CS discussed a plan to manufacture or experiment with MCDs in anticipation of the CS's visit to New York in March 2026. That is not surprising, for around the same time the Federal Aviation Administration revoked Wu's eligibility to train for a pilot's license in late October 2025, Wu began relying more heavily on phone calls and voice memos, and less on written messages, than he had in his previous communications with the CS. But the Government has nevertheless conferred with the CS, who, if called to testify at trial, would say that Wu instigated, drove, and eagerly participated in discussions regarding Wu's plans to manufacture and use MCDs prior to the CS's March 2026 visit. Given Wu's prior statements regarding MCDs, his expressed interest in creating such devices, and his enthusiasm for firearms more generally, the CS's version of events is more credible than that offered by the defense.

Additionally, the defense's characterization of the events leading up to the CS's visit in March 2026 cannot be squared with Wu's own words and conduct as captured in covert audio- and video-recordings taken during that visit. On March 14, 2026, when Wu first showed the CS one of the MCDs he had made, he appeared gleeful, smiling and laughing throughout the interaction. (*See* Ex. C). During that same conversation, Wu described with satisfaction how he had experimented with stainless steel before discovering that titanium was a more durable material

for purposes of making MCDs. (*See id.*). In a recording taken a few hours later, Wu pondered "where else [he] could get titanium from" and explained that he had to "break" a titanium credit card to create one of his experimental MCDs. (*See* Ex. D). When the CS noted that he and Wu could order titanium sheets, Wu responded, "hey, I could probably start getting into like, fu**ing manufacturing business." (*Id.*). Later that afternoon, after Wu and the CS arrived at the upstate property, Wu installed one of the MCDs in an AR-15-style assault rifle and explained how the device would function. (*See* Ex. E). A few minutes later, Wu again explained how he had "sacrificed" a titanium Apple credit card and repeatedly smiled and laughed as an individual standing nearby began to discern the device's intended function. (*See* Ex. F). Several hours later, after one of his companions fired a weapon that appeared to have been modified to fire in a fully automatic fashion, Wu can be heard laughing as the CS and the third individual cheer the accomplishment. (*See* Ex. G). And in a video taken the following evening, Wu demonstrated for the CS how he could use his laser engraving machine to etch an MCD out of a metal card, laughing exuberantly while doing so. (*See* Ex. H).

Once again, therefore, the portrayal of Wu offered by the defense—an upstanding entrepreneur reluctantly conscripted into unlawful activity by a longtime friend—is at odds with the record evidence. The covert video recordings of Wu taken during the CS's visit depict a willing, enthusiastic participant in illegal activity. Instead of reluctantly submitting to the CS's wishes, as the defense suggests, Wu appeared to relish his conduct, even as he acknowledged (with a grin) that the lethal devices he was trafficking could "put you in jail for three years." (Ex. C).

Indeed, to the extent Wu felt any sense of remorse or caution following the CS's visit, such sentiments were evidently short-lived. In a message thread the following month, Wu and the CS discussed specifications for the bulk titanium sheet metal that Wu would use to manufacture additional MCDs. Although Wu initially voiced concern that the titanium sheets appeared "way too thick" and would not be penetrated by laser, the CS reassured him that their thickness—0.032 inches—was "what the design schematic calls for" and was consistent with the thickness of metal credit cards. (Ex. I).[5] Wu's response was simple: "Ship it directly to me." (*Id.*).

### 3. *Videos of Wu Firing Pistol and AR-15-Style Assault Rifle*

Finally, the defense argues that the Court placed undue reliance on two videos in which Wu fired weapons that appeared to have been altered to function as fully automatic machineguns. (Bail Appl. 3–5). That those weapons had not in fact been altered by MCDs is "critically important," the defense argues, because the Court "clearly relie[d] on this claim as it open[ed] its analysis of whether Mr. Wu presents a danger to the community[.]" (*Id.* at 5 (citing Bail Appeal Tr. at 56:8–12)).

To address this argument, it is necessary to clarify the record on several points. The defense states, for example, that "when the Court inquire[d] further into the point of sending these videos

---

[5] Exhibit I contains photographs from law enforcement's manual review of one of Wu's cellphones, the full extraction of which has been produced to the defense. In the photographs shown in Exhibit I, the CS's messages appear in the lefthand column, and Wu's messages appear in the righthand column in blue.

to the CHS, the Government had no repsonse [sic], indicating that it would 'want to double check.'" (*Id.* (citing Bail Appeal Tr. at 30:16–18)). But the defense has misleadingly excerpted the relevant exchange, which unfolded as follows:

> THE COURT: And what is the commentary, if anything, because of that? What's the point of doing that?
>
> MR. HINES: I would want to double-check, your Honor, *but my understanding from the FBI is that it was boastful. It was expressing interest and a hobby of his, something he liked to do.* But he was demonstrating that he had the ability to convert semi-automatic weapons to fully automatic weapons.

(Bail Appeal Tr. at 30:16–22 (emphasis added)). Even accepting the defense's representation that the "prop handgun" seized by law enforcement is the same gun that Wu was firing in one of the videos he sent to the CS, (*see* Bail Appl. 3–4), the Government's characterization of Wu's purpose in sending that video was and is accurate. After Wu sent the CS a video in which another individual appears to be firing the same fully automatic pistol at the upstate property, the CS wrote, "[n]ice.. I like the full auto pistol." (Ex. J at 618). But rather than hastening to correct the CS and explain that the firearm was merely a "replica airgun" firing blanks, as the defense now emphasizes, (Bail Appl. 3–4), Wu sent the video of himself firing the gun, (*see* Ex. K), and wrote, "[y]eah I got the 30 round extended mag," (Ex. J at 619). After the CS responded, "[f]**king nice," Wu wrote, "[y]eah gotta remember it's NY lol" and, several messages later, "[d]oing hi capacity and full auto is nuts." (*Id.* at 619–20). When the CS again remarked that the fully automatic capacity was particularly impressive "[i]n a pistol though," Wu responded in relevant part, "[y]eah I leave all the full auto parts up there so in case I get pulled over I'm not getting screwed." (*Id.* at 620–21).

Wu's communications in this particular thread are most readily understood as boastful posturing, and, insofar as he led the CS to believe that he possessed an authentic pistol that could be made to fire in a fully automatic mode with "full auto parts" that he left upstate, Wu was indeed "demonstrating"—or at least pretending to demonstrate—"that he had the ability to convert semi-automatic weapons to fully automatic weapons." (Bail Appeal Tr. at 30:21–22). Similarly, while the Government accepts the defense's averment that Wu was using the "belt loop" method to file the AR-15-style assault rifle in the second video, (*see* Bail Appl. 4; Ex. L), the video still conveyed Wu's interest in modifying or otherwise manipulating firearms to circumvent their intended firing cycle.

Indeed, that is consistent with how the Court interpreted these videos. The Court observed, for example, that Wu is "the one who initiates the discussion or video sharing of firearms related information," and, on the assembled evidence, "appears to be something of a gun enthusiast and apparently to associate at least in part with people who are gun enthusiasts." (Bail Appeal Tr. at 56:10–12, 57:1–3). But while these videos demonstrate Wu's interest in firearms (particularly modified firearms), and supplied useful context for the Court's analysis of the charged conduct, the Court's dangerousness finding was predicated squarely on Wu's actual *transfer* of MCDs, not the videos he sent the CS. (*See id.* at 56:12–24; 57:8–58:2). Thus, the Court correctly understood

the import of these videos in the broader context of Wu's communications with the CS and did not place undue reliance on those videos in concluding that Wu poses a danger to the community.

B. Nature and Seriousness of Danger Posed by Defendant's Release

Turning to the "nature and seriousness" of Wu's danger to the community beyond the charged conduct itself, *see* 18 U.S.C. § 3142(g)(4), the Court observed that "the word reckless fairly attaches to a number of aspects of Mr. Wu's behavior[,]" particularly his conduct on the MTA. (Bail Appeal Tr. at 58:3–5). As the Court correctly noted, Wu had a fake MTA employee badge and uniform; he went "into places he's not supposed to go[,]" including a moving subway car; and he liked to "snoop[] around." (*Id.* at 58:5–8). Such "alarming behavior," noted the Court, "is indicative of somebody whose meter" for "risk" and "propriety"—for "following right lines"—"has not yet sharply developed." (*Id.* at 58:8–12). Wu's "impulse towards recklessness just leaps off the page of the facts here." (*Id.* at 58:14–15).

The defense now attempts to minimize Wu's reckless conduct by characterizing it as little more than "exploration" by an "inquisitive and impulsive" young man who "enjoys seeing and experiencing things that the general public is typically excluded from." (Bail Appl. 6, 7). But apart from representing that Wu has learned his lesson and will abstain from any MTA-related misconduct, the defense offers a handful of narrow assertions to rebut the Court's dangerousness finding. (*See id.* at 7). In particular, the defense argues that Wu "did not and cannot create fake identification badges"; that Wu's counterfeit MTA badge did not have "security features common to actual travel documents"; that his possession of counterfeit credentials does not indicate "some unique set of skills" that would enable him to abscond; and that Wu "did not possess a key fob." (*Id.* at 7). For the reasons outlined below, these arguments are either factually inaccurate or misguided, and the Government's concern over Wu's conduct with respect to the MTA system has only increased as its investigation has continued.

1. *Wu's Ability to Obtain Unauthorized Access Credentials*

As the Government has discussed in prior written submissions and oral arguments, Wu was able to acquire unauthorized MTA credentials—including keys—that enabled him to access the most sensitive and secure areas of the city's subway system. Those credentials allowed Wu to bypass subway turnstiles and enter the subway system through gates ordinarily reserved for MTA employees, law enforcement, and medical first responders. (*See* Ex. M at 00:40–00:54; Ex. N at 00:06–00:17; Ex. O).[6] The Government also understands from law enforcement that Wu's credentials would have allowed him to access sensitive underground infrastructure such as the MTA's server rooms. Likewise, as the Court also knows, Wu's credentials allowed him to access a secure operator's cabin on a moving subway train. (*See* Ex. P). That Wu apparently gained unauthorized access to the subway system using physical keys, instead of an electronic fob (as the Government had originally understood from law enforcement) is an immaterial detail. What matters, for purposes of the Court's bail determination, is that Wu has the connections, technical and financial wherewithal, and willingness to obtain and use these unauthorized credentials. Wu

---

[6] The Government respectfully requests that Exhibits M and N be filed under seal to protect the identify of the CS and the privacy of the public ridership.

could readily put those same skills and resources to use in attempting to flee law enforcement while on bail.

2. *Counterfeit MTA Identification Badges*

The defense also asserts that "Mr. Wu did not and cannot create fake identification badges." (Bail Appl. 7). Although the Government continues to investigate Wu's involvement in the production of counterfeit MTA credentials, the evidence it has uncovered to date again undermines the defense's assertion. The Government has obtained multiple sets of communications between Wu and other individuals that indicate Wu was actively involved in the procurement, creation, and sale of counterfeit MTA employee badges.

To take just one example, on October 2, 2024, Wu received a Signal message from an individual ("Client-1") who said to Wu, "Yo! How Much I Owe You For The Pass Bro? I Get Paid On Saturday So Lmk whenever!" (Ex. Q at 1).[7] After confirming that Client-1 "want[ed] one too[,]" Wu provided the price for his services: "$100 for my time and hologram[,] $45 for the pass from eBay[.]" (*Id.*). Shortly thereafter, Client-1 sent Wu a picture of himself for the badge and asked whether it was "[g]ood [e]nough[.]" (*Id.* at 2). Wu responded that it was and then asked Client-1 for his "title"—*i.e.*, the fictitious position that should appear on the counterfeit badge. (*Id.*). Wu then immediately sent Client-1 a picture of a "test print" of the badge. (*Id.* at 3). The badge, which appears highly authentic, contained the picture that Client-1 had sent to Wu and listed Client-1's title as "Manager." (*Id.*). After Client-1 sent Wu a different position that he wanted to be listed on his badge, Wu said "Ok" and sent Client-1 a picture of a new test print, this time with Client-1's preferred position. (*Id.* at 3–4).[8] After some additional correspondence, Wu sent Client-1 a video of the finalized badge. Client-1 responded: "🔥 Clean Bro!" (*Id.* at 5).

Wu went on to note that the badge he had created for Client-1 would be "[g]ood for another 5 years" and noted that "[their] first round is expiring next year." (*Id.*). Client-1 encouraged Wu to "Make A New One For You" (*i.e.*, for himself), to which Wu responded: "Already done[,] lol manager" and "[g]ot promoted"—clearly in reference to the position Wu had put on his own fake badge. (*Id.*). Wu then instructed Client-1 to send payment via the Zelle mobile payment platform. (*Id.* at 6). One day later, on October 4, 2024, Wu received a text notification from Bank of America indicating that Client-1 had sent him $75.00. (*See id.* at 13). On November 1, 2024, Wu received another Bank of America notification indicating that Client-1 had sent him another $75.00 for the "remainder." (*Id.*).

---

[7] The Court requests that Exhibit Q be filed under seal to protect the identity of Client-1, who has not been charged with a crime. Exhibit Q contains photographs from law enforcement's manual review of one of Wu's cellphones, the full extraction of which has been produced to the defense. In the photographs shown in Exhibit Q, Wu's messages appear in the righthand column in blue, while Client-1's messages appear in the lefthand column.

[8] The position that Client-1 requested for his counterfeit badge—"Structure Maintainer B (Mason)"—appears to have been taken from an MTA job posting from July 9, 2024. (*See* Ex. Q at 3).

On October 22, 2024—approximately three weeks after Wu created the counterfeit badge for Client-1 described above—Client-1 messaged Wu again and said, "Yo! Ima Be Paying You Next Week What I Owe You For The Pass," and then added, "Do You By Any Chance Have Any Extra Blanks? I'm Praying You Do. I Lost My Fu**ing Pass on Saturday[.]" (*Id.* at 8). Wu responded in relevant part, "I only got 2 left," and "the success rate is not 100%[.]" (*Id.*). Client-1 then asked Wu if Wu would be "Up For Giving [him] One" and noted that "The One [Wu] Gave [him] Was Really Well Done[.]" (*Id.*). Wu and Client-1 went on to discuss plans for Wu to create another fake badge. (*See id.* at 9–12). On December 28, 2024, Wu sent Client-1 another mock-up of the counterfeit badge and asked Client-1 whether it looked good. (*Id.* at 12).

These and similar messages between Wu and other individuals requesting counterfeit badges, as well as other evidence the Government has collected regarding Wu's procurement of holograms, leave no doubt that Wu was involved in manufacturing counterfeit MTA employee badges. The defense's assertion that Wu "did not and cannot create fake identification badges," (Bail Appl. 7), is false.

3. *Wu's Unlawful Use of Handheld Radios*

In addition to addressing Wu's underlying offense conduct and his unlawful activity related to the MTA subway system, the Court also cited his "reverse-engineering" of radios as another example of his "concerning" conduct. (Bail Appeal Tr. at 58:18–19). In response, the defense emphasizes that Wu has not yet been charged for this conduct and argues that "absolutely nothing about Mr. Wu's propensity to buy, sell, or lawfully reprogram radios suggests that he would be a flight risk or is dangerous to the community." (Bail Appl. 8).

As with Wu's unlawful activity on the subway system and his apparent creation and sale of counterfeit MTA badges, the Government continues to investigate Wu's technological manipulation and use of handheld radios. As previously discussed, the Government has gathered evidence that Wu has used a mix of both publicly available and proprietary (*i.e.*, not publicly available) software tools to modify the "code plugs" (*i.e.*, the internal software configuration) on Motorola handheld radios. By reprogramming and modifying the software and settings of these radios, Wu can send unauthorized transmissions over restricted law enforcement radio frequencies.

For example, in a video taken on September 28, 2022 and subsequently recovered from Wu's phone, Wu can be seen sending an unauthorized transmission over the NYPD "Citywide" radio frequency. (*See* Ex. R). Although anyone is free to download and monitor the Citywide frequency, only authorized public safety users (*e.g.*, police, EMS first responders) are authorized to send transmissions over the frequency. In this particular video, Wu appears to impersonate an authorized user, stating what sounds like, "detail portable to central, can I get a timecheck?" (*Id.*). Another user on the same frequency responds with the time. In another video taken on the same day, Wu can be seen sending another unauthorized transmission over the NYPD's Special Operation Division's radio frequency, stating, "SRG portable check." (Ex. S).[9] Someone on the other end responds, "five by five" (*i.e.*, radio lingo confirming that someone has been heard

[9] "SRG" stands for Strategic Response Group, *i.e.*, the NYPD's specialized unit for civil disorders, major events, and high-crime responses.

clearly). (*Id.*). The Government has also obtained evidence showing that, in addition to sending unauthorized transmissions over restricted law enforcement radio frequencies, Wu monitored these channels while trespassing in the subway system, effectively using his technical expertise to conduct countersurveillance during unlawful activity. Wu's ability to both monitor and impersonate public safety officers presents a clear risk of danger and could be used during an attempted flight from law enforcement.

C. Remaining Factors To Be Considered

The remaining § 3142(g) factors further support Wu's detention. As indicated by the Complaint, the details above, and the exhibits offered in support of the Government's opposition to Wu's renewed bail application, the weight of the evidence in this case, *see* 18 U.S.C. § 3142(g)(2), is overwhelming and leaves no question that Wu committed the charged offense. (*See also, e.g.*, Bail Appeal Tr. at 60:12–15 ("Without prejudging the case any more than the standard invites me to do so, I regard the evidence that has been proffered by the government as substantial.")). And, as the Court previously recognized, Wu's "history and characteristics," *see* 18 U.S.C. § 3142(g)(3)—including his status as a foreign national; his lack of "significant deep-seated friends here"; the fact his employment was "intertwined with his crime"; the flight risk posed by, among other things, his sentencing exposure and "material risk of deportation"; his "uncommon set of skills and assets that would assist flight," including the fact "[h]e literally knows how to fly"; and his substantial financial resources and "unusual tech capability"—"present[] an unusually high risk of flight[,]" (Bail Appeal Tr. at 59:7–12, 23–24; 60:16, 20–24; 61:1–2).

The "augmented" bail package now proposed by the defense does little to address the concerns previously identified by the Court. The Court already stated that it could not find that the presence of Wu's parents here in the United States "or even their willingness to put up some monetary assets and lose it is likely to dissuade Mr. Wu from either fleeing or being a danger to the community." (*Id.* at 61:10–13; *see also id.* at 61:17–20 ("I can't feel confident that Mr. Wu's having parental roommates ultimately would dissuade him from getting back at the business of making machine gun converter devices in particular.")). Given Wu's "significant incentives" to flee and "significant talents to do so"—including his unusual technical acumen—a GPS ankle monitor with home confinement does not provide a serious deterrent to flight. Finally, given the Court's clear findings with respect to the seriousness of Wu's conduct and risk of flight, the bond proposed by the defense is woefully insufficient to ensure his appearance or the safety of the community.

*****

For the foregoing reasons, the Court should decline to revisit its prior detention determination and deny the defense's request.

Respectfully submitted,

JAMES M. MCDONALD
United States Attorney

by: ______________________________
Christian Hines
Henry Ross
Assistant United States Attorneys
(212) 637-2631 / (212) 637-2442

cc: Counsel of record (via email and ECF)